No. 19-5150

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

ISAAC DONALD EVERLY,

*Plaintiff-Appellee*,

v.

PATRICE Y. EVERLY, PHILLIP J. EVERLY, CHRISTOPHER EVERLY,
PHILLIP EVERLY FAMILY TRUST, EVERLY AND SONS MUSIC (BMI),

*Defendant-Appellants*.

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:17-cv-01440
Hon. Aleta A. Trauger, United States District Judge

_____

# AMICUS BRIEF BY THE DIGITAL JUSTICE FOUNDATION
# IN SUPPORT OF NO PARTY AND REVERSAL

_____

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

*Attorneys for Digital Justice Foundation*

# CORPORATE DISCLOSURE STATEMENT

The Digital Justice Foundation, Inc. ("DJF")[1] is a 501(c)(3)-registered, non-profit corporation that advocates about issues of digital justice.

The DJF has no parent corporation and no publicly held corporation has any ownership stake in it. The DJF issues no shares and no publicly held corporation pays 10% of more of its dues or exercises 10% or more of its voting power.

The DJF responds to the Sixth Circuit-specific corporate disclosure inquiries as follows:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No, not to the knowledge of the DJF or its attorneys**.

Date: May 13, 2019        */s/ Andrew Grimm*
                               Andrew Grimm

---

[1] All parties have consented to the filing of the amicus brief, but do not necessarily agree with the legal positions taken in the brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the DJF certifies that (i) no party or party's counsel authored the amicus brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the amicus brief; and (iii) no person other than the DJF and its counsel contributed money intended to fund the amicus brief's preparation or submission.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

INTRODUCTION AND INTEREST OF AMICUS CURIAE ................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ................................................................................5

    I.     THE DISTRICT COURT ERRED IN CONFLATING AUTHORSHIP AND OWNERSHIP. ...........................................................................5

        A.    Authorship and ownership are fundamentally distinct concepts. ................................................................5

        B.    The district court misunderstood authorship. .............................9

        C.    The district court's authorship analysis would adversely affect the public domain. ..........................................12

        D.    The district court's authorship analysis would yield an unworkable copyright licensing regime. ...................................15

    II.    THE DISTRICT COURT ERRED IN APPLYING CONSTRUCTIVE NOTICE TO EXTINGUISH A PROPERTY RIGHT. ....................................17

        A.    Mullane and its progeny prohibit the use of constructive notice when interested parties can be provided direct notice. ..18

        C.    Absurd outcomes will result from a claim-accrual rule that deems Copyright Office filings to be constructive notice of repudiation. ..........................................................21

    CONCLUSION ............................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

The Digital Justice Foundation ("DJF") is a 501(c)(3), non-profit, public-interest organization. The DJF is dedicated to protecting individual rights in digital spaces and to ensuring that traditional notions of justice thrive in the digital age. As part of this mission, the DJF advocates for individual rights, including copyrights, privacy rights, and civil liberties, particularly where such rights are implicated by the Internet and other digital technologies.

The present appeal implicates the DJF's mission because its reasoning, if affirmed, would have highly negative policy consequences for both individual copyright holders and the public at large, *i.e.*, the members of the public who access public domain works. Worse, the district court works this policy error through multiple doctrinal errors in both copyright law and constitutional law.

Although the DJF takes no position on the underlying merits of authorship, the district court's refusal to reach those merits was error. At the outset, the district court misses a fundamental distinction in copyright between *authorship* and *ownership*. Eliding this admittedly copyright-specific nuance, however, could wreak havoc in licensing markets and lead to copyrights extended well beyond the duration Congress intended.

Furthermore, the district court's understanding of constructive notice contravenes longstanding constitutional doctrines. Worse, its reasoning would

invite outrageous chicanery by clever thieves to steal from co-creators or unrelated artists who do not frequently monitor copyright office filings—an obligation Congress did not place upon them.

Given fundamental errors of law below, the DJF writes separately to respectfully urge this Court to consider numerous doctrinal errors in the decision below, as well as the adverse policy consequences that would flow from affirmance.

Respectfully, this Court should reverse and remand.

# SUMMARY OF ARGUMENT

I.    The district court's decision conflated copyright authorship and copyright ownership. Authorship and ownership are fundamentally distinct concepts in copyright law, and they serve distinct functions throughout the Copyright Act. Importantly, authorship is a statutory and constitutional matter. Unlike ownership, authorship is not transferable. Moreover, authorship is determined by the creation of the work itself and is not affected by post-creation conduct. Whereas ownership can change over time, authorship remains fixed. The district court improperly made its authorship analysis based on the parties' post-creation conduct and contracts. In addition to being doctrinally improper, the district court's authorship analysis invites problematic policy consequences. The district court's understanding of authorship would adversely affect the public domain and would raise novel constitutional concerns about copyright term duration. Finally, the court's authorship analysis would inject uncertainty and liability into the copyright licensing ecosystem. Affirming the district court's authorship analysis would thus profoundly disrupt established reliance interests in this Circuit.

II.    Additionally, the district court relied on a constitutionally insufficient theory of constructive notice in its statute of limitations analysis. In deciding when

to start the clock running on the three-year statute of limitations, the district court held that Copyright Office filings were public records that repudiated other party's' copyright interests by putting them on constructive notice. The district court's theory of constructive notice is at odds with decades of Supreme Court precedents requiring attempts at *direct* notice when a known party's rights are implicated by legal action. Therefore, the district court's constructive notice theory falls short of the constitutionally sufficient notice demanded by *Mullane* and its progeny. The district court's theory of constructive notice is not only bad law, but would also yield manifestly unjust results. The district court's constructive notice theory would invite and reward a situation in which unscrupulous, opportunistic co-authors and faux-authors filed misleading authorship filings in the Copyright Office. If three years happened to pass without the proper author discovering the filings, such false filings would preclude forever a work's rightful author from any author's rights. Such a rule, if affirmed, would usher in unjust results, and such unjust results would fall disproportionately hard on individual creators without the legal resources, sophistication, or acumen to routinely affirmatively police the Copyright Office's filings.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN CONFLATING AUTHORSHIP AND OWNERSHIP.

### A. Authorship and ownership are fundamentally distinct concepts.

In copyright law, authorship and ownership are distinct concepts. The two concepts—authorship and ownership—are related because ownership "vests initially" with the author, upon a work's creation. 17 U.S.C. §201(a). However, authorship and ownership serve distinct functions throughout the Copyright Act.

Importantly, authorship is both a statutory *and* constitutional matter. See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.06[A] (2019); see also Paul Goldstein, Goldstein on Copyright §2.2.2 at 2:25 (3d ed. 2017) (discussing "the question of authorship under the Copyright Act and the Constitution").

The Supreme Court has defined an author as the person "to whom [a work] owes its origin[.]" Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884)). The author is thus the person who supplies sufficient creative input to the work's creation. 1 Nimmer on Copyright §2.01[A][1]; c.f. Childress v. Taylor, 945 F.2d 500, 506 (2d Cir. 1991) (adopting the view of the Register of Copyrights that joint

5

authorship is "required by the statutory standard of 'authorship' and perhaps by the Constitution.").

The Copyright Act establishes three types of authorship:  "individual, joint and work made for hire."  Goldstein on Copyright §4.1.  Where a person does not meet one of these standards of authorship, that person cannot simply be deemed to do so by agreement. See id. at §4.3 ("Even if the employer and employee agree that *ownership* of the copyright in a work made for hire shall initially vest in the employee, the employer remains the work's '*author*' for all purposes under the Act." (emphasis added)).

In short, authorship "is not subject to variation by agreement between the parties."  1 Nimmer on Copyright §1.06[C].  Instead, the standards of authorship are established by statute and constitutional requirements.  Authorship is not a matter of contractual agreement, and the statutory and constitutional standards of authorship cannot be contracted around.

Properly determining a work's author is a matter of "profound significance." Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989).  Determining who the author of a work is also determines:

(1)  the initial ownership of copyrights in that work, 17 U.S.C. §201(a);

(2)  the duration of copyright protection for that work, 17 U.S.C. §302(c);
     and

6

(3) who possesses the termination rights for copyrights in that work, 17

     U.S.C. §203(a).

Importantly, the identity of a work's *author*, determines how long the copyright *owner* will enjoy exclusive rights in a copyrighted work.

By statute, copyright lasts for the life of the *author* plus 70 additional years after the author's death. 17 U.S.C. §302(a). Thus, a determination of authorship also determines when the copyrights expire for all copyright owners of a particular work. The identity of the author, in turn, determines when a work enters into the public domain, free for public use.

Distinct from authorship, copyright ownership confers control over the copyrighted work. It is the "owner of copyright" who has the "exclusive right to do and authorize" uses of the copyright works. 17 U.S.C. §106. It is the copyright owner who has standing to sue for infringement of the protected works. 17 U.S.C. §501(b). And, it is the copyright owner who is entitled to money damages from infringers. 17 U.S.C. §504(b)-(c). Cf. 17 U.S.C.§ 101 (defining "[c]opyright owner" to include an owner of merely one of the exclusive rights listed in 17 U.S.C. § 106).

The transferability of copyright ownership distinguishes it from copyright authorship. Ownership, initially vests in the author upon a work's creation. 17 U.S.C. §201(a). But, copyright ownership "may be transferred in whole or in part

by any means of conveyance[,]" including by contract.  17 U.S.C. §201(d)(1).

Indeed, post-creation transfer of ownership is common practice.  <u>See, e.g.</u>, <u>Harper</u>

<u>& Row, Publrs., Inc. v. Nation Enters.</u>, 471 U.S. 539, 546-547 (discussing the post-

creation transfer of *ownership* rights by authors).[2]

    Ownership is subject to transfer by contractual agreement, but authorship "is

not subject to variation by agreement between the parties."  1 <u>Nimmer on</u>

<u>Copyright</u> §1.06[C].  Ownership is transferable and can be contracted away.

Authorship cannot be.

    Instead, authorship is established by the act of creation itself.  Authorship

therefore must be assessed by looking to the *time of creation*. See e.g. <u>Childress</u>,

945 F.2d 500, 507 (2d Cir. 1991) ("There remains for consideration the crucial

aspect of joint authorship—the nature of the intent that must be entertained by each

putative joint author *<u>at the time</u>* the contribution of each was *<u>created</u>*." (emphasis

added)).

---

[2] "Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright.  Under the Copyright Act, these rights—to publish, copy, and distribute the author's work—vest in the author of an original work from the time of its creation. § 106.  In practice, the author commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work."  <u>Harper & Row</u>, 471 U.S. at 546-547.

Authorship, unlike ownership, cannot change over time. Thus, a party's post-creation conduct does not speak to authorship. In sum, authorship is a fixed star in the copyright constellation. Ownership, by contrast, is a moving target.[3]

## B. The district court misunderstood authorship.

The district court's decision below manifests a confusion about both the nature of authorship and the fundamental distinctions between *authorship* and *ownership* in copyright law.

As a general matter, the district court elides the two concepts repeatedly throughout its opinion. Indeed, the clearest indication of this confusion is found in Section B of the district court's opinion (entitled "The Defendant's Ownership Claim"). Although the section purports to be about ownership claims, the section

---

[3] The DJF respectfully urges this Court to clarify the distinction between authorship and ownership. Because the distinction is a subtle, albeit important, matter of technical copyright doctrine, district courts often elide the two concepts. This is particularly true amongst district courts that do not routinely encounter copyright cases. However, because authorship and ownership serve distinct purposes throughout various provisions of the Copyright Act, conflating the two concepts in any particular dispute will create profound ripple effects beyond the scope of the present dispute. Clarification as to the distinct nature of authorship and ownership would go a long way to clarifying easily avoidable confusion in this area of law for district courts hearing such cases.

speaks exclusively in terms of *authorship* and nowhere mentions ownership, except in the title.

More specifically, the district court improperly relied upon evidence about *ownership* to make its determinations about *authorship*.  For example, the district court erred when it consider post-creation contracts and other conduct in the "totality of the circumstances" that go into determining authorship.  Mem. Op. at 16, PageID #517.  ("The court finds, based on the totality of the evidence referenced above, that Don Everly plainly and expressly repudiated Phil Everly's claim to joint *authorship* […]").

While such considerations properly speak to the issue of copyright ownership, such considerations are inapposite to determinations of authorship.  In conducting its authorship analysis, the court considered:

(1) the 1980 Release purporting to relinquish authorship rights; and

(2) "the accumulation of events that *followed* the execution of that release[,]" Mem. Op. at 15-16, PageID #516-517 (emphasis added).  Both these considerations were in error, since both pieces of evidence are inapposite to an analysis of authorship.

Any contracts between the parties could not have *altered* who the author was at the time of creation.  In other words, whether the work in question was one of sole authorship or one of joint authorship is not a matter of contractual agreement.

Instead it is a factual question which asks who contributed sufficient creative contributions to meet the statutory and constitutional standards of authorship.

Thus, the court's reliance on the 1980 Release in its analysis of authorship was therefore error because facts that are not relevant to authorship could not possibly be a clear repudiation of authorship. (Even if they could be relevant to authorship, their primary relevance to copyright ownership would make them not a clear repudiation of ownership.) While ownership is transferable, authorship is not, meaning the only way to clearly repudiate authorship is to object to the facts that pertain to the creation of the work.

In sum, the 1980 Release may be a transfer of ownership or a waiver of rights to accounting, royalty payments, and/or even public attributions of authorship. Nevertheless, the 1980 Release could not as a matter of law transfer or waive *authorship* status itself. The termination right created by §§ 203 and 304 is itself "inalienable" and non-waivable. See, e.g., N.Y. Times Co. v. Tasini, 533 U.S. 483, 497 (2001); Stewart v. Abend, 495 U.S. 207, 230 (1990). The same is true of authorship status.

Whatever post-creation agreements the parties to this case (and Phil Everly) may have had between themselves, those agreements simply do not speak to authorship status.

Thus, the district court erred when it treated the issue of authorship as a matter subject to contractual arrangements between the parties, *i.e.*, as a matter affected by the 1980 Release and subsequent contracting. While these considerations certainly speak to the issue of ownership, they are inapposite to the issue of authorship, which is the basis of the termination right in dispute here.

In turn, actions which do not clearly repudiate authorship, as opposed to ownership, cannot be the basis of a claim-accrual date for determining when the statute-of-limitations shall run.

The district court erred in relying on any facts that could go to ownership as a clear repudiation of Phil Everly's authorship when determining the claim-accrual date.

**C.      The district court's authorship analysis would adversely affect the public domain.**

The district court failed to appreciate the effects of copyright authorship on the public domain when it treated authorship as transferable between parties. Moreover, the district court's understanding of authorship would disrupt Congress' statutory compliance with constitutional requirements that copyrights exist only for a limited period of time.

Copyright grants the owner exclusive rights against the public. 17 U.S.C. §106. When those rights expire, they enter into the public domain. The constitutional "requirement that those exclusive grants be for 'limited Times' serves the ultimate purpose of promoting the 'Progress of Science and useful Arts' by *guaranteeing* that those innovations will enter the public domain *as soon as the period of exclusivity expires*". Eldred v. Ashcroft, 537 U.S. 186, 223 (2003) (emphasis added).

That the owner's copyrights against public use of the work be temporary is required by the constitution. U.S. Const., Art. I, § 8, cl. 8. Congress satisfies that constitutional requirement with 17 U.S.C. §302(a)-(b), which establishes the duration of copyright at life of the author plus 70 years. Who the author is, in turn, determines when the owner's copyrights expire. See 17 U.S.C. §302.

Thus, allowing parties to contract or transfer authorship status would allow parties to extend the duration of copyright protection via contractual arrangements. Transfers of ownership is not subject to this concern because no matter who the owner is, once the author becomes deceased, the clock starts ticking on the 70 years before the work enters the public domain. But to allow parties to transfer authorship would allow parties to simply start that clock over.

To treat authorship as a contractual matter would thus disrupt the constitutional requirement that copyright "enter the public domain *as soon as the*

*period of exclusivity expires.*" <u>Eldred v. Ashcroft</u>, 537 U.S. 186, 223 (2003) (emphasis added). Thus, the district court's treating authorship as transferable or waivable raises constitutional concerns.

Moreover, treating authorship as transferable between parties would undermine the public domain, as a matter of policy. The district court failed to appreciate that *any* dispute over authorship status affects not just the parties to a particular case, but also the public at large. By setting the term of protection for the copyright *owner*, authorship balances the *owner*'s rights against the public at large. In short, any authorship dispute will always affect the scope of the public domain by determining when a particular work will enter the public domain.

The district court's authorship analysis, allowing transfer of authorship by inter-party agreement, overlooked these constitutional concerns and the public's interest. These concerns flag the problems with treating authorship--a statutory and constitutional matter--as a function of inter-party contract.[4]

---

[4] Respectfully the DJF urges this Court to clarify that all disputes of authorship implicate the public interest in the public domain by affecting term length of copyright. Both *Feist* and *Eldred* make clear that any dispute over authorship will raise constitutional questions. The constitutional concerns raised by and the public interest in authorship disputes are easily overlooked by district court's presented with what appears to be merely inter-party disputes about authorship.

**D.** **The district court's authorship analysis would yield an unworkable copyright licensing regime.**

Authorship is set by the act of creation and at the time of creation. The district court's understanding of authorship however would allow for post-creation alterations to authorship.

Allowing *ex post* contracts and conduct to alter authorship would significantly disrupt the copyright licensing ecosystem. Affirming the district court's authorship analysis would make preventative due diligence--copyright clearance through a chain-of-title analysis--all but impossible. And, such an understanding of authorship would profoundly jeopardize existing reliance interests by copyright licensees and transferees.

Ownership "vests initially" with the author. 17 U.S.C. §201(a). The author may then transfer his or her ownership to another. 17 U.S.C. §201(d)(1). From there, the new owner may further transfer copyright ownership, and so on. Identifying the current copyright owner is, therefore, often a matter of tracing subsequent contractual agreements back to the author. Cf. 17 U.S.C. §201(a). ("vests initially").

To clear a copyright work for use, identifying the *author* has served as the starting point for a chain-of-title search to correctly identify the current copyright *owner*. See g.g, Playboy Enters. V. Dumas, 53 F.3d 549, 553 (2d Cir. 1995)

(discussing how determining "the author of the works" determines "who can later transfer the copyright").

Identifying the current copyright owner is necessary to obtain a valid license for use of the work. This, in turn, requires first identifying the author and establishing a valid chain back to a valid series of transfer from the author to subsequent owners. But, the district court's decision would allow such valid chains of transfer to be invalidated, after the fact, exposing all downstream licensees to the strict liability of copyright infringement. Allowing parties to change authorship status--either through contractual agreement or by their post-creation actions-- would thus yield an unworkable copyright regime.

For example, had Phil Everly, prior to the 1980 repudiation of his authorship, made any transfer of copyright then the transferee would suddenly become infringers years later, after the fact when the authorship status changed after the works creation and after that transfer. The district court's allowance of post-creation alterations to authorship would render invalid and infringing previously valid ownership transfers. Such a rule would expose all transferees of the disavowed author to the strict liability of copyright liability.

For that reason making authorship a moving target rather than a fixed star in the copyright constellation would be a policy disaster. The district court's authorship analysis makes not just bad law and bad doctrine, but also bad policy.

## II. THE DISTRICT COURT ERRED IN APPLYING CONSTRUCTIVE NOTICE TO EXTINGUISH A PROPERTY RIGHT.

Below, the district court relied upon a theory of constructive notice to decide when the clock started for the three-year statute of limitations.

The district court reasoned that Don's Copyright Office filing was a "public record" that repudiated anyone else's copyright interests, thereby putting Phil's statutory heirs on constructive notice of his repudiation. Mem. Op. at 16-17, PageID #517-518.

The district court's theory of constructive notice is a novel theory—and a bad one. This theory is at odds with decades of Supreme Court precedents requiring attempts at _direct_ notice when a known party's rights are implicated by legal action, not merely constructive notice like publication. See Section II.A, _infra._

Moreover, the theory would work manifestly unjust results. On the district court's reasoning, an unscrupulous co-author who happens to file a claim of authorship at the Copyright Office—unbeknownst to other genuine co-author— could forever preclude that genuine author's rights. See Section II.B, _infra._

**A. <u>Mullane</u> and its progeny prohibit the use of constructive notice when interested parties can be provided direct notice.**

As far back as 1950, the district court's kind of constructive notice has been rejected.

In 1950, the U.S. Supreme Court issued its decision in <u>Mullane v. Central Hanover Bank & Trust Co.</u> 339 U.S. 306 (1950). At issue was a *private party*, a common trust, that sought to extinguish the rights of various beneficiaries to sue it for mismanagement of their funds. <u>Id.</u> at 309. The "only notice given beneficiaries of this specific application was by publication in a local newspaper[.]" <u>Id.</u>

Certain beneficiaries sued and Justice Jackson, writing for the Court, noted that it was then not doctrinally clear "when constructive notice may be utilized or what test it must meet." <u>Id.</u> at 314. He proceeded to point out that notice by publication had sever due process problems because it was so ineffective that it often failed to inform those whose rights were at issue. <u>Id.</u> at 314-316.

Thus, in <u>Mullane</u>, the Supreme Court distinguished two categories of persons with rights and implicated interests—and required different levels of notice:

(1) There are those "whose interests or whereabouts could not with due diligence be ascertained" and for whom notice by publication is appropriate. <u>Id.</u> at 317.

(2) Yet for "beneficiaries of known place of residence, however, notice by publication stands on a different footing"—it's insufficient. Id. at 318. Notice to them via "the mails" is appropriate instead. Id. at 318.

After Mullane, the Supreme Court repeatedly emphasized that constructive notice was not enough when one party sought to extinguish another's rights. See, e.g., New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296 (1953) ("Notice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best."); Walker v. City of Hutchinson, 352 U.S. 112, 117 (1956) ("In too many instances notice by publication is no notice at all.").

Moreover, requiring for something better than constructive notice where someone's rights were knowingly at issue are not a mere technicality. Instead, notice is a "vital corollary to one of the most fundamental requisites of due process—the right to be heard." Schroeder v. New York, 371 U.S. 208, 212 (1962). Thus, before extinguishing property rights, the party that acted through lawful mechanism to do so has to attempt "the personal notice that the rule enunciated in the Mullane case requires." Id. at 213; see also Lambert v. California, 355 U.S. 225, 228-229 (1957) (striking down a criminal registry law when the criminal defendant was "wholly passive and unaware" of the law).

In 1983, the Supreme Court furthered restricted the number of parties that could receive constructive notice. In <u>Mennonite Board of Missions v. Adams</u>, one party had a recorded mortgage on a house and the homeowner was not paying property taxes. 462 U.S. 791, 792 (1983). The county provided notice that it would sell the home for non-payment of property taxes by direct mail to the homeowner and constructive notice through newspaper publication. <u>Id.</u> at 794.

The Supreme Court held that the additional interested party, the mortgagee, that had a claim on the house, should have received direct notice, not merely notice by publication. <u>Id.</u> at 798 ("This case is controlled by the analysis in Mullane. To begin with, a mortgagee possesses a substantial property interest that is significantly affected by a tax sale.").

In sum, "notice by publication is adequate only where it is *not possible or practicable* to give more adequate warning." <u>Jones v. Flowers</u>, 547 U.S. 220, 237 (2006) (internal quotations).

These principles are equally applicable here. The district court reasoned that a constructive notice by publication of a public record at the Copyright Office was sufficient to extinguish someone else's copyrights.

That analysis is contrary to <u>Mullane</u> and its progeny. Phil Everly's heirs do not have conjectural rights nor did Don Everly present any evidence he attempted to notify them of his decision to terminate transfers. Thus, Don Everly owed them

an attempt at direct notice, a letter notifying them that he was seeking to terminate any claim they might have to the copyright. As with mortgagees and trust beneficiaries, when Don Everly took steps to extinguish their rights he should have provided notice beyond the constructive notice at the Copyright Office.

If he did not, his constructive notice by filing at the Copyright Office is _constitutionally insufficient_ to extinguish their property rights as statutory heirs to Phil Everly's portion of his copyrights. His termination is invalid insofar as it purports to exclude others who are clearly interested parties without giving them, via direct notice, a meaningful opportunity to be heard in a meaningful time. Here, "there seem to be no compelling or even persuasive reasons why such direct notice cannot be given." See Walker v. City of Hutchinson, 352 U.S. 112, 116 (1956).


**C.     Absurd outcomes will result from a claim-accrual rule that deems Copyright Office filings to be constructive notice of repudiation.**

The easiest way to understand the unintended, but highly disruptive, policy consequences of the district court's opinion is to compare a copyright registration with a patent application.

Patent applications are mandatory. If the would-be patentee does not apply for a patent, the time period to file will expire and the invention will no longer be patentable.

In a patent application, the Patent and Trademark Office's ("PTO's") examiner will look to facts and evidence that relate to who actually invented the patent. The patent examiner will try to ensure that the patented subject matter is novel in the sense that no one else has come up with that idea beforehand, ruling out other possible inventors. See 35 U.S.C. § 102(a) (novelty requirement). Furthermore, the patent examiner will use his or her scientific training to assess whether the patent would "have been obvious" to a person of "ordinary skill" in that field. See 35 U.S.C. § 103 (non-obviousness requirement).

As part of the patent examination process, the patent examiner is also going to ensure that any public disclosures of the patented invention relate back to the patent applicant. See 35 U.S.C. § 102(b)(1). So, the patent examiner is inevitably going to be investigating some facts that relate to who genuinely invented the subject matter of the patent.

Copyright doesn't work that way. Copyright protection subsists in "works of authorship fixed in any tangible medium of expression"—meaning copyright protection exists at the moment of fixation. 17 U.S.C. § 102(a). Indeed, copyright registration is not required. 17 U.S.C. § 408(a) ("Registration Permissive"). Instead, copyright registration is merely a precondition to an infringement lawsuit. 17 U.S.C. § 411(a).

This means that many authors do not register their copyright. While large media conglomerates that invest millions in movie or music production do consistently register their copyrights, individual creators often do not. In turn, many copyright policymakers felt that requiring a starving artist to hire a copyright lawyer, in order to have a chance reaping the financial rewards of his or her creative work, was unfair.[5]

Unlike with patent applications, copyright registration is, therefore, permissive and not all rightful copyright holders will register their works immediately upon creation. As often happens, authors only register the works when they become economically important or frequently infringed.

In addition, copyright registration does not look at facts pertaining on authorship. Even if there is nearly identical prior creative works, so long as the secondary work was independently created—*i.e.*, created by someone else without reference or knowledge of the original—it is entitled to a separate copyright. See Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2003) ("Original . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.").

---

[5] By analogy, few would advocate for bureaucratic formalisms that required everyday office workers to retain an employment lawyer and engage with a government bureaucracy before accepting a job offer. Requiring registration as a condition to copyright protection is the near-equivalent in the copyright world.

Thus, like the PTO does with patents, the Copyright Office will be ensuring that the claimed subject matter is appropriate for copyright protection. Unlike the PTO, however, the Copyright Office will not be looking into the background and underlying facts that relate to whether the party seeking registration is actually the author.

Instead, the Copyright Office will merely be determining whether the musical work, novel, computer program, etc., is appropriate for copyright. The registration process also defines the scope of the copyrighted work. <u>See</u> Matthew J. Astle, <u>Help! I've Been Infringed and I Can't Sue!: New Approaches to Copyright Registration</u>, 41 U. Mem. L. Rev. 449, 486-487 (2011) (Registration primarily serves to "to define with specificity the work at issue in the lawsuit.").

The risk of the district court's rationale is great as a result. The PTO, due to the very nature of patents, is conducting some investigation into the validity of a patent application and of <u>*who*</u> the inventor is. By contrast, the Copyright Office is <u>*not*</u>. Quite literally, the Copyright Office's registration provides no assurances that the party registering a copyright is, in fact, the author or owner of that copyright.

Thus, holding the Copyright Office filing to constitute constructive notice of an adverse claim of authorship makes no sense.

Any opportunistic co-author could register a copyrighted work and assert both authorship and ownership in his name alone. If a mere three years pass, the

other author or owner would, on the district court's reasoning, be entirely barred from compensation without any genuine indicia that a co-author has cheated. (After all, the copyright office wouldn't know to inform the cheated co-author. Only the charlatan would.)

Going further, the district court's rationale does not meaningful distinguish why an entirely fraudulent copyright registration claim would not trigger the statute of limitations. There is nothing in its rationale that would differentiate between Don Everly's copyright filings and, say, any other person who asserted ownership at the copyright office. In that way, the district court's rationale opens a pathway for largely (or why not entirely) fraudulent Copyright Office filings to extinguish the statutory rights of copyright authors and their heirs without any connection to the work.

Perhaps, highly sophisticated and lawyered-up media conglomerates could routinely police copyright office filings. Yet the individual creators who are also part and parcel of the copyright system cannot. Many have no idea of the intricacies of registration. Indeed, Congress gave no indication in that the statute that it would have wanted them to spend their time and efforts on that, rather than enriching society with new creative works.

In sum, the district court's rule on constructive notice fundamentally misunderstands the nature of Copyright Office's filings and, by deeming them

constructive notice, opens loopholes for unscrupulous actors to steal without any real possibility that the victims know until it is too late.  That is not what Congress ordained.

# CONCLUSION

This Court should reverse and remand.

Date: May 13, 2019                          Respectfully submitted,


*/s/ Andrew Grimm*
Andrew Grimm
15287 Pepperwood Drive
Omaha, NE 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

*Attorney for Digital Justice Foundation*

# CERTIFICATE OF COMPLIANCE

This brief contains **5867** words, _not_ excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.


Date: May 13, 2019                          Respectfully submitted,

                                            _/s/ Andrew Grimm_
                                            Andrew Grimm
                                            15287 Pepperwood Drive
                                            Omaha, NE 68154
                                            (531) 210-2381
                                            andrew@digitaljusticefoundation.org

                                            _Attorney for Digital Justice Foundation_

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2019, I electronically filed the foregoing

AMICUS BRIEF with the Clerk of the Court for the United States Court of

Appeals for the Sixth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.


Date: May 13, 2019                Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm
15287 Pepperwood Drive
Omaha, NE 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

*Attorney for Digital Justice Foundation*